2024 IL App (2d) 230237-U
No. 2-23-0237
Order filed April 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| KAREN LONG MACLEOD, | ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 22-CH-217 |
| COMMONWEALTH EDISON and EXELON CORPORATION, | ) ) ) ) | Janelle K. Christensen, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not err in dismissing plaintiff's complaint for failure to state a claim for an equitable accounting or a violation of the Consumer Fraud Act. Affirmed.

¶ 2   Plaintiff, Karen Long MacLeod, sued defendants, Commonwealth Edison (ComEd) and its parent company, Exelon Corporation, after defendants entered into a deferred prosecution agreement concerning ComEd's bribery of associates of former Illinois House Speaker Michael Madigan. In a two-count complaint, she asserted a claim for an equitable accounting and a violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act)

(815 ILCS 505/1 *et seq.* (West 2022)). Plaintiff sought disgorgement of ComEd's actual and projected benefits from its criminal scheme and further sought punitive damages in her consumer fraud count. Defendants moved to dismiss plaintiff's complaint, arguing that the court lacked jurisdiction (*i.e.*, pursuant to the separation of powers and filed rate doctrines), plaintiff lacked standing, and that she failed to state a claim. 735 ILCS 5/2-615, 2-619(a)(1), (9) (West 2022). The trial court: dismissed the complaint, with prejudice, finding that plaintiff failed to state a claim with respect to both her accounting and consumer fraud counts; denied defendants' motion with respect to their jurisdictional arguments; and made no findings concerning the standing argument. Plaintiff appeals, arguing that she adequately pleaded claims for an equitable accounting and violation of the Consumer Fraud Act. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                    A. Deferred Prosecution Agreement

¶ 5    On July 17, 2020, the United States Attorney for the Northern District of Illinois and ComEd entered into a deferred prosecution agreement, wherein ComEd admitted to bribery of Madigan's associates in an effort to influence and reward Madigan's efforts to assist ComEd with respect to legislation concerning the company. The parties agreed that ComEd would pay a $200 million criminal penalty (and adopt and maintain remedial measures) in exchange for the government's agreement that it would not, with limited exceptions, bring any civil or criminal case against ComEd. ComEd further agreed not to seek to recover any portion of the fine through charges to its customers.

¶ 6    The facts set forth in the agreement (and to which ComEd stipulated) were as follows. As a utility, ComEd is subject to regulation by the state, including regulation concerning the rates it charges its customers and the rate of return it may realize from its business operations. In 2011,

the General Assembly passed the Energy Infrastructure and Modernization Act (EIMA) (Pub. Act 97-616 (eff. Oct. 26, 2011); Pub. Act 97-646 (eff. Dec. 30, 2011)), which provided for a regulatory process under which ComEd could more reliably determine rates it could charge customers and determine how much money it could generate from its operations to cover, among other things, costs for grid-infrastructure improvements. The statute, therefore, helped improve ComEd's financial stability. EIMA was passed by the House of Representatives around May 2011 and by the Senate around August 2011. The Governor vetoed it, but, in October 2011, both houses of the legislature overrode the veto. In 2016, the General Assembly passed the Future Energy Jobs Act (FEJA) (Pub. Act 99-906 (eff. June 1, 2017)), which provided for a renewal of the regulatory process that was beneficial to ComEd.

¶ 7    Madigan (referred to in the agreement as "Public Official A") was the speaker of the House of Representatives and the longest-serving member of that body. ComEd understood that, as speaker, Madigan "was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd."

¶ 8    Individual A served in the House of Representatives for about 10 years beginning in 1972. Afterward, Individual A served as a lobbyist and/or consultant for ComEd until 2019. During that time, Individual A made known to ComEd that Individual A had a close personal relationship with Madigan.

¶ 9    Between 2011 and 2019, in an effort to influence and reward Madigan's efforts as speaker to assist it with respect to legislation, ComEd arranged for Madigan's associates to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even where they performed little or no work. During this time, $1,324,500 in payments

(either through Company 1, a company that performed consulting services for ComEd, or additional third-party vendors) were made to Madigan's associates. Third-party vendors entered into contracts with ComEd that noted the payments to the vendors from ComEd were for consulting and related services; in truth, "a substantial portion of the money paid to these vendors was intended for Madigan's associates" and "were intended to influence and reward Madigan in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly."

¶ 10   ComEd also entered into a contract with a law firm in 2011 to provide it with 850 hours of work per year. It was entered into, in part, "to influence and reward [Madigan] in connection with Madigan's official duties and because personnel and agents of ComEd understood that giving this contract to [the firm] was important to [Madigan]." In 2016, the law firm's contract was up for renewal and ComEd sought to reduce the hours of legal work it provided to the firm. After an attorney from the firm contacted Individual A about ComEd's plan, Individual A contacted ComEd's chief executive officer, noting that the attorney was valuable to Madigan. The chief executive officer directed a ComEd employee to "assist with the project of obtaining legislative approval for FEJA, to ensure that [the law firm's] contract was renewed." This employee, assigned as a project manager, was tasked with ensuring the firm's contract was renewed, "because the work provided to [the firm] was, in part, designed to influence and reward [Madigan] in connection with [Madigan's] official duties, including the promotion and passage of FEJA."

¶ 11   Finally,

"[b]etween in or around 2011 and in or around 2019, during the same time frame that ComEd was making payments to [Madigan's] associates, and extending other benefits for the purpose of influencing and rewarding [Madigan], ComEd was also seeking

[Madigan's] support for legislation that was beneficial to ComEd, including EIMA and FEJA, that would ensure a continued favorable rate structure for ComEd. ComEd acknowledges that the reasonably foreseeable anticipated benefits to ComEd of such legislation exceeded $150,000,000."

¶ 12                                B. Plaintiff's Complaint

¶ 13    On November 3, 2022, plaintiff, a ComEd customer, sued defendants, attaching to her complaint a copy of the deferred prosecution agreement. In count I, she alleged an equitable accounting and sought disgorgement of the benefits from ComEd's criminal scheme (as set forth in the agreement). Plaintiff alleged that ComEd owes its customers the duty not to charge more than a fair and reasonable rate and that this duty creates a special relationship between ComEd and consumers that is equivalent to a fiduciary duty. Plaintiff further asserted that she lacked an adequate remedy at law because legislative acts that benefitted ComEd had not been determined to be illegitimate, void, or voidable. However, ComEd's admissions in the deferred prosecution agreement showed, she asserted, that it had secured a large and unjust benefit, at a cost to its customers, through a course of criminal conduct, including bribery, corruption, and connivance. Plaintiff also alleged that there was a need for discovery because, although ComEd admitted its criminal conduct made it reasonably foreseeable that it anticipated to receive at least $150 million more than it should have absent its criminal conduct, it had not admitted or made an accounting of what was the actual amount at issue. ComEd's scheme also amounted to fraud, plaintiff alleged, such that an accounting is appropriate and necessary to uncover the true benefit ComEd enjoyed. She asserted as to the accounting count that her suit sought "to determine the basis for ComEd's admissions that it anticipated to receive at least $150,000,000 or more in benefits from its illegal scheme of bribery, corruption, and connivance. That is the 'accounting.' "

¶ 14    Plaintiff sought: certification of a class of all persons who purchased electricity, electricity delivery services, or related goods and/or services from ComEd in the last five years; an accounting of defendants' actual and projected benefit from ComEd's criminal scheme; and, upon the accounting, a disgorgement and/or other equitable relief order tied to the actual benefit and projected benefit from ComEd's scheme.

¶ 15    In count II, plaintiff alleged that defendants violated the Consumer Fraud Act by engaging in a deceptive and harmful practice during their criminal scheme.  Specifically, ComEd admitted to a deceptive business practice—securing favorable government action for its benefit through a bribery scheme.  Further, as it admitted to expecting at least a $150 million benefit as a result of its dishonest and corrupt practice, its bribery scheme substantially harmed Illinois consumers and is independently actionable apart from the deception and fraud inherent to public bribery, corruption, and connivance.  Plaintiff further asserted that, as a direct and proximate result of ComEd's admitted bribery, corruption, and connivance, she has paid more fees to ComEd than ComEd should have been entitled to absent the illegal and criminal scheme; that is, she suffered actual damages because of defendants' deceptive and harmful business practices and, as such, has standing to sue.  Plaintiff asserted that she did not seek legal damages, but, rather, other relief (815 ILCS 505/10a(a) (West 2022)), including disgorgement and punitive damages.

¶ 16    Plaintiff also alleged that the safe harbor clause in section 10b of the Consumer Fraud Act (*id.* § 505/10b) does not insulate defendants from liability, because ComEd's admitted bribery tainted the legitimacy of any legislative or regulatory action and, thus, defendants are equitably and judicially estopped from asserting that ComEd's scheme was specifically authorized within the meaning of the statute.  Plaintiff asserted that it would be unjust and inequitable to allow defendants to admit to securing $150 million in reasonably expected benefits through an unlawful

scheme of bribery, corruption, and connivance, only to subsequently argue that the acts were specifically authorized in any legitimate manner within the meaning of section 10(b)(1). Finally, plaintiff alleged that, because of the admitted bribery, defendants have unclean hands and are barred from asserting any equitable defense.

¶ 17    Plaintiff sought: class certification; an accounting of defendants' actual and projected benefit from ComEd's criminal scheme; upon the accounting, a disgorgement and/or other equitable relief order tied to the actual and projected benefit of the criminal scheme; and punitive damages in the amount of 10 times the disgorged profits.

¶ 18                              C. Suits Against ComEd

¶ 19    After the deferred prosecution agreement, seven class action lawsuits were filed against ComEd that were ultimately consolidated in federal and state courts.

¶ 20    In *Gress v. Commonwealth Edison Co.*, 559 F. Supp. 3d 755 (N.D. Ill. 2021), the plaintiffs alleged that bribery of Madigan's cronies resulted in the passage (*i.e.*, he "used his powers to ensure House members would vote in support") of several laws—EIMA, the 2013 EIMA amendments (Pub. Act 98-15 (eff. May 22, 2013)), and FEJA—that resulted in increased rates for the electricity they purchased. They sought relief under the Racketeer Influenced and Corrupt Organizations (RICO) Act (18 U.S.C. § 1962(c) (2022)), the Consumer Fraud Act, and for conspiracy, and unjust enrichment. The plaintiffs alleged that the legislation allowed ComEd to charge higher rates for electricity, and they sought "money damages as reimbursement for the inflated rates they paid for the electricity they used" (*id.* at 763), *i.e.*, the difference between the inflated rates they paid and the rates they would have paid absent the laws. ComEd moved to dismiss for failing to state a claim. Fed. R. Civ. P. 12(b)(6). The district court dismissed the RICO claim, with prejudice, and declined to exercise supplemental jurisdiction over the remaining state-

law claims, which it dismissed without prejudice. *Id.* at 770-71. The court addressed two issues: (1) the filed rate doctrine,[1] which it noted was an affirmative defense that the plaintiffs had not alleged and admitted and, thus, would not warrant dismissal; and (2) the RICO claim, which the defendants had moved to dismiss for failing to state a claim and under the separation of powers doctrine.[2] As to RICO, the court noted that the plaintiffs were required to plausibly allege that a RICO violation was not only a "but for" cause of injury, but also the proximate cause. *Id.* at 765. Proximate cause under RICO, it noted, turns on whether the alleged violation led directly to the plaintiffs' injuries, not foreseeability. *Id.* The court found that the plaintiffs had sufficiently alleged "but for" causation but not proximate cause, where they did *not* allege that: that the bribes of Madigan caused House and Senate members to vote in favor of the legislation; that Madigan improperly influenced other legislators who voted to pass the bills; the bribery caused the governor to sign FEJA into law; that it caused members of the House and Senate to vote in favor of EIMA; what pressure was put on legislators; or how Madigan provided votes to override the Governor's

---

[1]Under that common-law doctrine, "Illinois state courts cannot adjust rates that have been filed with the appropriate regulator for any reason." *South Branch , v. Commonwealth Edison Co.*, 46 F.4th 646, 650 (7th Cir. 2022). "It protects public utilities and other regulated entities from civil actions if the entity is required to file its rates with the governing regulatory agency and the agency has the authority to set, approve, or disapprove the rates." *Corbin v. Allstate Corp.*, 2019 IL App (5th) 170296, ¶ 8. A "filed rate that is approved by the governing regulatory agency is *per se* reasonable and unassailable in judicial proceedings brought by rate payers." *Id.*

[2]See Ill. Const. 1970, art. II, § 1 ("The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another.").

veto of the EIMA amendments. *Id.* at 766-67. However, the court declined to dismiss the RICO claim *without* prejudice because it determined that, although the plaintiffs did not argue that the legislative enactments were nullities and sought reimbursement ("damages") for the effect the laws had on the rates they paid for electricity, they were, *in effect*, arguing that the laws were nullities ("[i]n essence, [the] plaintiffs' RICO claim is a collateral attack on three Illinois laws"). *Id.* at 770. It was not possible, the court determined, to assess the merits of the RICO proximate cause issue without considering the motives of the legislators who voted for the laws, and contemplating motive violated *Fletcher v. Peck*, 10 U.S. 87, 131 (1810) ("[A] court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.") *Id.*

¶ 21     On appeal, in *South Branch*, the Seventh Circuit affirmed, but construed ComEd's motion as one for judgment on the pleadings and considered the filed rate doctrine. *South Branch*, 46 F.4th at 649. It held that the filed rate doctrine, which barred judicial determinations of reasonable utility rates, foreclosed the RICO claim for damages ("the plaintiffs seek monetary damages (and not declaratory or equitable relief) for 'overpay[ment] for electricity' from ComEd under RICO"). *Id.* at 650-51, 653. Thus, the plaintiffs suffered no legally cognizable injury by paying the legal rate. *Id.* at 654.

¶ 22     In the state case, *In re Commonwealth Edison Co. Illinois Consumer Fraud Litigation (ComEd)*, 2023 IL App (1st) 220105, the plaintiffs alleged violations of the Consumer Fraud Act, unjust enrichment, and violations of the Public Utilities Act (220 ILCS 5/201 (West 2022)). In one of the consolidated cases, the plaintiffs alleged that ComEd perpetrated a fraud on Illinois residents and sought restitution for ComEd customers "for the unjust enrichment of ComEd caused

by the passage of EIMA and FEJA." *Id.* at ¶ 5. The defendants moved to dismiss (735 ILCS 5/2-619 (West 2022)), arguing the trial court did not have jurisdiction because the Illinois Commerce Commission (ICC)[3] approved the charged rates, the filed rate doctrine barred the court from issuing an order inconsistent with a utility tariff (*i.e.*, inconsistent with the rates and charges with respect to services), and the separation of powers doctrine barred the trial court from considering the motivations of the General Assembly. The trial court dismissed the consolidated complaints, with prejudice, on the basis that it lacked jurisdiction under the separation of powers doctrine, which precluded review of the motivations underlying legislative action. The court denied the plaintiffs' motion for reconsideration and for leave to file an amended complaint.

¶ 23    On appeal, the plaintiffs did not challenge the grounds on which the trial court dismissed their complaint; instead, they argued that the court erred in dismissing the complaint *with prejudice*. They maintained that they could have amended their factual allegations such that their complaint did not run afoul of the separation of powers doctrine; specifically, they would focus on Madigan's actions. The First District found their argument waived, because a motion to reconsider

---

[3]The Public Utilities Act creates the ICC, which has exclusive jurisdiction over rates under the statute. 220 ILCS 5/2-101, 4-101 (West 2022). The rates must be based on its finding that they are just and reasonable. *Id.* § 9-201(c); see also *State ex rel. Pusateri v. Peoples Gas Light & Coke Co.*, 2014 IL 116844, ¶ 12. The ICC's orders within its statutory authority are not subject to collateral attack. *Id.* ¶ 15 (quoting *Peoples Gas Light & Coke Co. v. Buckles*, 24 Ill. 2d 520, 528 (1962)). Claims for reparations, which are claims that a utility has charged too much for a service, must first be made to the ICC. *Id.* ¶ 18.

cannot raise new arguments that could have been raised earlier. *Id.* ¶ 21. It affirmed the trial court's judgment that it lacked jurisdiction to consider the matter. *Id.*

¶ 24     The First District next determined that, *even if* it read the appeal as a challenge to the trial court's application of existing law, the plaintiffs' arguments still failed. *Id.* ¶ 22. Reviewing the issue *de novo*, the court examined the proximate cause issue and noted that the plaintiffs' argument that the deferred prosecution agreement showed an illegal scheme in which elected officials were incentivized by ComEd to pass legislation beneficial to it inquired into legislators' motivations to pass the relevant bills. *Id.* ¶ 24. The court held that the bribe to Madigan's associates, without more, was *not* a material element in causing injury to the plaintiffs. *Id.* ("Merely creating the condition for the injury, the bribe, without more information, cannot be said to have been the proximate cause for the passage of legislation; although Madigan "had the ability to bring a bill to the floor, the bill had to garner the necessary votes for it to pass."). Also, as pleaded, the First District could not ascertain whether there were any intervening causes for the injury that broke the nexus between the bribe and the passage of legislation. *Id.* To discern any nexus would involve investigation of legislators' motivations that led to passage of the relevant bills, which the court could not do. *Id.*

¶ 25     Finally, the First District noted that it would still affirm, even assuming, *arguendo*, it considered the amended complaint, which would have focused solely on Madigan's actions. *Id.* ¶ 25. The plaintiffs alleged that Madigan had previously blocked legislation from ComEd before the plan to bribe him and that he had made statements that unrelated bills from other legislators would not make it to the floor without their vote in approval of the ComEd bills in question. *Id.* The First District determined that, taking the allegations as true, Madigan could not singlehandedly pass the bills. *Id.* "Once the process involved the rest of the legislature, the only way to grant

relief was to necessarily look to the motivations of the legislature to determine if the illegal incentives—instead of legitimate consideration—convinced the legislature to pass the bills." *Id.* The First District agreed with the trial court that there "was no avenue for the plaintiffs to allege causation without asking for the court to invade the province of the legislature." *Id.* Thus, dismissal with prejudice was proper. *Id.*

¶ 26                               D. Defendants' Motion to Dismiss

¶ 27    On February 3, 2023, defendants moved to dismiss plaintiff's complaint. Preliminarily, defendants noted that state and federal courts had dismissed similar suits against defendants, several of which requested disgorgement and alleged consumer fraud. Defendants asserted that plaintiff's effort to distinguish her case from the others failed because her assertion that she did not seek damages but, rather, disgorgement of any benefits ComEd earned from its conduct, was no distinction at all and that the other suits likewise sought that relief. Defendants took the general position that any alleged benefit ComEd earned came from rates paid for electric service that were lawfully authorized and found just and reasonable by the ICC under a regulatory process established by the legislature. Plaintiff's allegation that the laws have a tainted legitimacy, they asserted, violated the separation of powers doctrine, which prohibits courts from disregarding validly enacted statutes because of legislative improprieties, and her demand that ComEd refund the rates it was authorized to collect violated the filed rate doctrine, which prohibits claims seeking to recoup utility charges authorized by ICC-filed tariffs.[4]

---

[4]A tariff is a document setting forth services being offered, rates and charges related to the services, and governing rules, regulations, and practices relating to the services. 220 ILCS 5/16-108.5(c) (West 2022); *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 55 (2004).

¶ 28    Defendants also provided more context to the relevant legislation, noting that EIMA was passed in 2011 by bipartisan supermajorities in both the House and Senate, after widespread and prolonged power outages exposed the vulnerability of the electric grid. The prior ratemaking structure frequently resulted in extended lag time between investment in improvements and recovery of the costs in rates. The new legislation provided that, if the state's two electric utilities committed to investing in modernizing the grid, they could seek to recover their actual costs through annually updated rates, subject to ICC review to ensure those costs were prudent and reasonable. 220 ILCS 5/16-108.5(c), (d) (West 2022). The utilities made such improvements. In 2016, the legislature, again by lopsided bipartisan votes in both chambers, passed FEJA to extend EIMA and promote clean energy and energy efficiency. ComEd filed, and the ICC approved, tariffs allowing ComEd to recover the resulting costs in its rates. 20 ILCS 3855/1-75(d-5)(6) (West 2022).

¶ 29    Defendants further noted that, after ComEd entered into the deferred prosecution agreement, several lawsuits were filed against them. While they were pending, the legislature passed, and the governor signed, the Climate and Equitable Jobs Act (CEJA) (Pub. Act 102-662 (eff. Sept. 15, 2021)), which expanded FEJA and addressed the deferred prosecution agreement. The legislation required the ICC to investigate whether ComEd caused the expenditure of ratepayer funds in connection with the conduct detailed in the deferred prosecution agreement. 220 ILCS 5/4-604.5(b) (West 2022). It required a refund to ratepayers of any funds the ICC determined were not lawfully recoverable through rates. *Id.* Following the ICC's investigation and a litigated proceeding, defendants noted, the ICC ordered ComEd to provide over $30 million in refunds to consumers in 2023.

¶ 30    Turning to the substance of their motion, defendants argued that the court lacked jurisdiction (735 ILCS 5/2-619(a)(1) (West 2022)), plaintiff lacked standing (735 ILCS 5/2-619(a)(9) (West 2022)), and the complaint failed to state a claim (735 ILCS 5/2-615 (West 2022)) for an accounting or under the Consumer Fraud Act.  First, as to jurisdiction, defendants argued that plaintiff's contention that the bribery tainted the legitimacy of ComEd's rates was barred by the separation of powers doctrine and that plaintiff was merely seeking to relabel her claim as one for disgorgement.  Defendants argued that the duly-authorized legislation required ComEd to collect the rates established under EIMA and FEJA and set forth in its filed tariffs, and equity could not be used to undo that which the law authorizes.

¶ 31    Second, also as to jurisdiction, defendants argued that the filed rate doctrine barred plaintiff's complaint, where the ICC determined that the rates were just and reasonable charges recovering the reasonable and prudently-incurred costs of the electric service provided and where ComEd filed tariffs with the ICC to collect those rates.  Third, defendants asserted that plaintiff lacked standing because she failed to plead any legally cognizable injury.  735 ILCS 5/2-615, 619(a)(9) (West 2022).  Defendants noted that plaintiff alleged that she did not challenge any rate set or approved by the ICC, that the bribery proximately caused any legislative act, or allege that consumers would have paid a lower rate but for the bribery.  They argued that an actual injury to plaintiff and not merely an alleged benefit to defendants was a prerequisite to any judicial remedy, whether for an accounting or under the Consumer Fraud Act.  Defendants also asserted that plaintiff misread the deferred prosecution agreement, that ComEd did not admit that the bribery proximately caused any legislative act or that the relevant legislation produced that benefit, and that ComEd did not admit therein that customers suffered any injury as a result.

¶ 32    Fourth, defendants argued that plaintiff failed to state a claim for an accounting.  They asserted that there is no freestanding claim to which an accounting is tethered, and plaintiff did not adequately plead a fiduciary relationship between ComEd and its customers (aside from one conclusory assertion).  They also argued that plaintiff did not plead any need for discovery or adequately allege any fraud (*i.e.*, she did not allege any misrepresentations by ComEd to plaintiff or any reliance by plaintiff).  Finally, defendants argued that plaintiff did not allege complex mutual accounts and that the only mutual account between ComEd and plaintiff was plaintiff's billing account as a ComEd customer.

¶ 33    Defendants' fifth argument was that plaintiff failed to state a claim under the Consumer Fraud Act.  Specifically, they asserted that she failed to plead several required elements: ComEd's intent that plaintiff rely on an unfair or deceptive practice; her actual reliance on the practice; and that she suffered actual damage that was proximately caused by the unfair or deceptive practice.  As to the first two elements, defendants maintained that plaintiff did not allege that ComEd intended for her to rely on anything and that the alleged scheme of bribery, corruption, and connivance was not directed toward customers and did not depend on any reliance by plaintiff.  They also asserted that plaintiff did not allege that she relied on anything ComEd did or said.  As to actual damage, defendants argued that plaintiff disavowed any request for damages or any allegation that consumers would have paid lower rates but for the bribery.  As to proximate cause, defendants asserted that plaintiff made no factual allegation showing that the bribery proximately caused the passage of legislation or increased rates; indeed, she disavowed the need to allege and prove proximate cause.  However, defendants noted, proximate cause is an element of a cause of action under the Consumer Fraud Act.  Further, plaintiff could not have adequately pleaded proximate cause, they contended, because proving that bribery proximately caused the legislation's

passage requires inquiry into the subjective motivations of the legislators who voted for it, resulting in a separation of powers problem. Even aside from the separation of powers issue, they maintained, plaintiff could not plead any direct relationship between the bribery and the rates she paid, which were separated by an entire legislative process, bipartisan votes in the House and Senate, and an ICC regulatory process.

¶ 34                                     E. Trial Court's Ruling

¶ 35     On June 16, 2023, the trial court granted defendants' motion to dismiss, with prejudice, for failure to state a claim with respect to both the accounting and Consumer Fraud Act counts, denied the motion with respect to their jurisdictional arguments (*i.e.*, separation of powers and filed rate doctrines), and made no findings with respect to the standing argument. As relevant here, the court determined as to the equitable accounting count that plaintiff sufficiently pleaded that she had no adequate remedy at law because she sought an accounting for the ongoing profit to ComEd from the favorable legislation (not the dollars ComEd spent to bribe Madigan, which was the subject of the ICC proceeding). However, it found that plaintiff did not adequately plead an additional element of an accounting: a breach of a fiduciary relationship between the parties, a need for discovery, fraud, or the existence of mutual accounts that are of a complex nature. As to the Consumer Fraud Act count, the court found that plaintiff could not show that any alleged damage was proximately caused by the legislature enacting the laws at issue; specifically, she failed "to allege that Madigan put any improper pressure on the legislature such that he controlled their votes." Plaintiff appeals.

¶ 36                                     II. ANALYSIS

¶ 37     Plaintiff argues that the trial court erred in dismissing her complaint for failure to state a claim. A motion filed under section 2-615 of the Code of Civil Procedure challenges the legal

sufficiency of the complaint. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25. When deciding such a motion, the court must consider whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief may be granted. *Id.* However, a court need not draw unreasonable or unwarranted inferences to sustain the sufficiency of the complaint. *Costa v. Stephens-Adamson, Inc.*, 142 Ill. App. 3d 798, 802 (1986). In opposing a section 2-615 motion, "a plaintiff may not rely on mere conclusions of law or fact unsupported by specific factual allegations." *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). A court must not dismiss a complaint under section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery. *Reynolds*, 2013 IL App (4th) 120139, ¶ 25. In ruling on such a motion, the court considers only (1) the facts apparent from the face of the pleadings, (2) matters that are subject to judicial notice, and (3) judicial admissions contained in the record. *Id.* We review *de novo* the dismissal of a complaint under section 2-615. *Id.*

¶ 38                           A. Equitable Accounting Count

¶ 39    Plaintiff argues first that her equitable accounting count should not have been dismissed for failing to state a claim. She contends that she adequately pleaded the elements of an accounting.

¶ 40    "An accounting is a statement of receipts and disbursements to and from a particular source." *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 93. To state a cause of action for an accounting, the complaint must establish that there is no adequate remedy at law and *one* of the following: (1) a breach of a fiduciary relationship between the parties, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts that are of a complex nature. *Id.* Courts "typically do not

enforce the requirement that there be no adequate legal remedy when the accounting is based on a breach of fiduciary duty. *Chicago Architectural Metals, Inc. v. Bush Construction Co., Inc.*, 2022 IL App (1st) 200587, ¶ 61. "The right to an accounting is not an absolute right, but one which should be accorded only on equitable principles. Because the need for an accounting is dependent on the particular facts of each case, there are no guidelines for determining when an accounting is warranted." (Internal citations and quotation marks omitted.) *Tufo*, 2021 IL App (1st) 192521, ¶ 93.

¶ 41    Here, the trial court found that plaintiff sufficiently pleaded that she had no adequate remedy at law, where she sought an accounting for the ongoing profit ComEd sustained from the favorable legislation. However, it found that plaintiff did not adequately plead an additional element of accounting: breach of a fiduciary relationship; a need for discovery; fraud; or the existence of mutual accounts of a complex nature.

¶ 42    Addressing whether she pleaded that she has no adequate remedy at law, plaintiff argues that she need not plead this element and, alternatively, that she adequately pleaded it by alleging that the end result of ComEd's bribery was legislation. We assume, *arguendo*, that, to the extent this element is required, plaintiff adequately pleaded it.

¶ 43    Turning to the remaining elements, plaintiff primarily argues that she satisfied both the breach-of-fiduciary-duty and fraud prongs. Addressing fiduciary duty, she notes that other special relationships can support an accounting and argues that the relationship between ratepayers and a public utility is one such relationship. Victims of bribery can sue for an accounting, she argues. In any event, she contends that, because Madigan owed a fiduciary duty as a public official and breached it by taking bribes, by bribing him, ComEd was an active participant in the breach. She

is entitled to an accounting, she argues, because the court can view the bribes as a breach of duty or as a fraud.

¶ 44  We reject plaintiff's argument. "Constructive trusts and equitable accounting are approved remedies in Illinois against public officials who have profited by a breach of their fiduciary duty." *County of Cook v. Lynch*, 560 F. Supp. 136, 140 (N.D. Ill. 1982).  These remedies may also be used against "third parties who are willing participants in schemes to cause public officials to breach their fiduciary duty." *Id.* at 140-41.  "To state a claim for breach of fiduciary duty, it must be alleged and ultimately proved: (1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69.  Plaintiff did not adequately plead that ComEd owes her, a rate payer, a fiduciary duty.  ComEd may owe a duty to the public and its stockholders.  See *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 218 (1919) (public service company "owes a duty to the public as well as to its stockholders and must charge no more than a reasonable rate for service rendered.").  However, any duty relating to rates and charges is statutory.  See 220 ILCS 5/8-101, 8-401 (West 2022) (addressing duties of public utilities); see also 220 ILCS 5/9-101 (West 2022) (rates and charges must be just and reasonable).  Further, as to any breach, the rates ComEd charged were approved by the ICC and, therefore, plaintiff cannot challenge them.  See *Corbin*, 2019 IL App (5th) 170296, ¶ 8 (a "filed rate that is approved by the governing regulatory agency is *per se* reasonable and unassailable in judicial proceedings brought by rate payers").  Indeed, in her complaint, she alleged that she "does not challenge any utility rate set or approved by the [ICC]" and "[t]his suit does not challenge any rate set under Illinois law."  Finally, plaintiff also argues that Madigan, as a public official, owed a fiduciary duty to the public and, by attempting to

influence and reward him, ComEd "participated in the breach." This argument is forfeited, because it is raised for the first time on appeal (*Vantage Hospitality Group, Inc. v. Q Ill Development, LLC*, 2016 IL App (4th) 160271, ¶ 49 ("a party who fails to make an argument in the trial court forfeits the opportunity to do so on appeal")) and, in any event, as we discuss below in addressing her Consumer Fraud Act count, plaintiff did not sufficiently plead proximate cause, which is a required element of a breach-of-fiduciary-duty claim (*Lawlor*, 2012 IL 112530, ¶ 69).

¶ 45    Addressing fraud, plaintiff argues that bribery is a type of fraud or deceit upon which an accounting can be stated. She asserts that ComEd could have rebuffed Madigan, but, instead, bribed him. Bribery, she maintains, satisfies the fraud element of a right to an accounting. Just as a public official may be held to account for and disgorge the proceeds of any bribery, plaintiff argues, so, too, may any person/entity who, like defendants, knowingly participated in and benefitted from that bribery. We reject this argument. The elements of common law fraud are: (1) a false statement of material fact, (2) the defendant's knowledge that the statement was false, (3) the defendant's intent that the statement induce the plaintiff to act, (4) the plaintiff's reliance upon the truth of the statement, and (5) the plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996). In her complaint, plaintiff did not allege that defendants made any false statements to her or that she relied upon any such statements and suffered damages as a result. Instead, she pleaded as to fraud that ComEd's bribery scheme "amounts to fraud such that an accounting is appropriate and necessary to uncover the true benefit enjoyed by ComEd such that a court may order the disgorgement of that benefit." This is insufficient.

¶ 46    Plaintiff's brief arguments that she adequately pleaded the need for discovery and that there are mutual accounts of a complex nature also fail. As to discovery, she pleaded that there is a need

for discovery because, although ComEd admitted that it anticipated at least $150 million more in benefits than it should have absent its criminal conduct, it has not admitted or made an accounting of the actual amount at issue, both immediately and over the long term. First, plaintiff misreads the deferred prosecution agreement. The agreement states that, during the time that ComEd made the payments to Madigan's associates to influence and reward him, it also sought his support for legislation that was beneficial to ComEd that would ensure a continued favorable rate structure for ComEd. The agreement further provides that ComEd "acknowledges that the reasonably foreseeable anticipated benefits to ComEd of *such legislation* exceeded $150,000,000." (Emphasis added.) Thus, contrary to plaintiff's allegations and her arguments on appeal, ComEd did not admit that the bribery benefited it in an amount exceeding $150 million; rather, it sought Madigan's support for beneficial legislation and admitted that the anticipated benefits to ComEd of "such legislation" was over $150 million. Second, plaintiff did not plead that the information she seeks is unavailable or has not been produced elsewhere, such as to the ICC. For these reasons, she did not adequately plead a need for discovery.

¶ 47 Nor did plaintiff sufficiently plead mutual accounts of a complex nature. In her complaint, she alleged that ComEd "manipulated the complex manner in which it can secure more profits," and has not "set forth or admitted with clarity how the legislative acts it procured translated to the expected" $150 million benefit. She also alleged that the way defendants secured and maximized profits was complex and includes technical aspects of the rate-setting formula and increasing investment in its grid. These allegations are insufficient, because plaintiff failed to identify the existence of any mutual accounts. Indeed, the only account she has with ComEd is her customer account, which is not the focus of her pleadings. Again, her pleadings address the complex manner

in which ComEd secures profits, and her customer account cannot reasonably be characterized as complex.

¶ 48    In summary, the trial court did not err in determining that plaintiff failed to state a claim for an equitable accounting.

¶ 49                              B. Consumer Fraud Act Count

¶ 50    Plaintiff's second argument is that she adequately pleaded a Consumer Fraud Act violation. The elements of a claim under the Consumer Fraud Act are (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception or practice, (3) the occurrence of the deception in the course of conduct involving trade or commerce, (4) actual damage to the plaintiff, and (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002); see also *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶ 21. The Consumer Fraud Act does not require actual reliance. *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 543 (1992). The statute provides remedies for purely economic injuries, and actual damages must be calculable and measured by the plaintiff's loss. *Flores v. Aon Corp.*, 2023 IL App (1st) 230140, ¶ 41. Intent under the statute means that the defendant intends for the plaintiff to rely on the deception, as opposed to the defendant's intent to deceive. *Ash v. PSP Distribution, LLC*, 2023 IL App (1st) 220151, ¶¶ 23-26. Further,

> "[t]he element of proximate cause contains two requirements: the cause-in-fact and the legal cause. *Bell v. Bakus*, 2014 IL App (1st) 131043, ¶ 23. In the context of a fraud claim, cause-in-fact is 'but for' cause. *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 269 (2005). 'That is, the relevant inquiry is whether the harm would have occurred absent the defendant's conduct.' *Id.* Legal cause requires that the alleged injury be a foreseeable consequence of the alleged misrepresentation. *City of Chicago v. Michigan Beach Housing*

*Cooperative*, 297 Ill. App. 3d 317, 326 (1998)." *Phillips v. DePaul University*, 2014 IL App (1st) 122817, ¶ 51.

¶ 51    In her complaint, plaintiff alleged that ComEd engaged in a deceptive practice in the course of its bribery scheme to secure favorable government action.  She further asserted that, as ComEd admitted to expecting at least a $150 million benefit as a result of its corrupt practice, its bribery scheme substantially harmed consumers.  Plaintiff also alleged that, "as a direct and proximate result of ComEd's admitted scheme of bribery, corruption, and connivance," she "has paid more fees to ComEd than it should have been entitled to absent that illegal and criminal scheme" and, thus, suffered actual damages.

¶ 52    The trial court found that plaintiff could not show that any alleged damage was proximately caused by the legislature enacting the relevant legislation.  Specifically, it determined that plaintiff failed to allege that Madigan improperly pressured the legislature such that he controlled their votes.  The court noted that it accepted as true that Madigan had the *de facto* ability to control which bills were called to vote.  Thus, plaintiff "may meet the first prong of proximate cause because the bills would not have passed but-for Madigan accepting a bribe to call them."  However, the court determined that plaintiff's allegation was not "sufficient to satisfy proximate cause, because it was not foreseeable that Madigan's power in calling the bill to vote was the *legal cause* of the injury" (emphasis added) because the House and Senate "had to vote before the bills became law.  Plaintiff fails to allege that Madigan put any improper pressure on the legislature such that he controlled their votes."  The court cited *Gress* and *South Branch* and noted that, without facts pleading that Madigan controlled the votes of the House and Senate, foreseeability could not be shown.

¶ 53    Plaintiff argues that bribery offends public policy.  ComEd, she asserts, admitted that it reasonably expected to benefit by more than $150 million through its bribery and corruption scheme and, thus, bribery caused substantial injury to consumers.  Plaintiff argues that ComEd used bribery—an act against public policy—to secure more than "$150 million in charges to be paid by consumers" like her.  It is apparent, she contends, that it secured a large benefit through its scheme; otherwise, what is the basis for the admitted $150 million value of the benefit received from its bribery that formed the basis of the $200 million fine?  Plaintiff also argues that the foreseeability requirement of legal cause is not a high burden, and the relevant inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.  The passage of EIMA and FEJA, she contends, was a likely result of bribing Madigan.  She notes that, in the deferred prosecution agreement, ComEd agreed that Madigan "was able to exercise control over what measures were called for a vote" and "had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd."  Plaintiff reads this language as reflecting that ComEd bribed Madigan because it was foreseeable that currying his favor would ensure a continued favorable rate structure for it with the reasonably foreseeable anticipated benefits to ComEd exceeding $150 million.  She maintains that ComEd essentially admitted in the deferred prosecution agreement that it was foreseeable that its bribery would cause the very benefit it secured through passage of EIMA and FEJA, which was a likely result of ComEd's pernicious and ongoing bribery of Madigan.

¶ 54    Plaintiff relies on *Kramer v. Szczepaniak*, 2018 IL App (1st) 171411, where the First District reversed the circuit court's dismissal for failure to state a negligence claim. *Id.* ¶ 80.  In *Kramer*, an Uber driver who had gotten lost ejected two passengers from his vehicle at 2 a.m., before he had completed the trip.  The passengers walked for several blocks in a dark, poorly

illuminated, high crime area where there was a high volume of traffic, limited traffic control devices, and third parties departing from drinking establishments in various states of sobriety. They were struck by a third party who was speeding and failing to keep a proper lookout, resulting in significant injuries to the passengers. The First District held that dismissal was improper, because reasonable minds could differ on the question whether the accident was foreseeable as a result of the Uber driver ejecting the passengers from his vehicle in the middle of the night in a dimly lit and high traffic area where cars were driving recklessly and patrons were leaving drinking establishments. *Id.* ¶ 4. The court noted that it could not conclude as a matter of law that the driver's negligence bore no causal relationship to the passengers' injuries. *Id.* On the issue of legal cause, the court explained that the inquiry was "whether the intervening, negligent driving of [the driver who struck the passengers], in speeding and failing to yield to pedestrians in a crosswalk, was reasonably foreseeable to [the Uber driver] *** after [the Uber driver] ejected [the passengers] from the vehicle far away from their agreed-upon destination." *Id.* ¶ 38. The court determined that the danger of being hit by a car was not so remote as to be unforeseeable as a matter of law. *Id.* ¶ 42. The Uber driver's negligence was not passive, and he "materially *worsened* [the passengers'] position." (Emphasis in original.) *Id.* ¶ 70.

¶ 55    Here, plaintiff argues that the facts—bribing Madigan, who had substantial influence and control over other lawmakers—have a more integral causal connection to the passage of legislation than ejecting passengers has to their later being struck by a speeding and failing-to-yield third party. She contends that, because it might have been foreseen and expected that bribing Madigan for many years could result in favorable legislation being passed, ComEd's bribery scheme was a legal cause of the passage of EIMA and FEJA and the resulting higher rates collected from plaintiff and other electricity consumers. The trial court, she asserts, erred first in failing to ascertain that

pleading that Madigan had the power to control what bills were called for a vote supports a finding of foreseeability (and, hence, legal cause and, finally, proximate cause). A bill cannot be passed without being called and, by ensuring a bill is called, an interested party can foresee it passing. Second, plaintiff asserts that the trial court ignored that, in addition to controlling what bills were called, Madigan had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd. This is a well-pleaded fact admitted by defendants, she maintains, that is contrary to the trial court's reasoning that, without pleadings that Madigan controlled the vote of the House and Senate, it was not foreseeable that his act of placing bills on call would result in their passage. Plaintiff's position is that merely controlling which bills get called satisfied proximate cause; Madigan having substantial influence and control over his peers, combined with other facts alleged, is sufficient to show proximate cause; or, at the very least, reasonable minds could differ on this point and, as such, the case should proceed with discovery and have the facts put to a factfinder.

¶ 56 Defendants respond first that we should follow the First District's decision in *ComEd* and conclude that proximate cause could not be pleaded. *ComEd*, 2023 IL App (1st) 220105, ¶ 24. Second, they argue that there is no allegation in the deferred prosecution agreement that Madigan used his influence to corrupt the vote of any other legislator on the relevant legislation. They note that 110 legislators of both parties voted to pass EIMA and 95 legislators of both parties voted to pass FEJA. Defendants assert that, although Madigan enjoyed influence and control in the abstract, this falls short of the specificity needed to show that he hijacked the legislature and overrode the independent judgment of the elected representatives.

¶ 57 We conclude that the trial court did not err in determining that plaintiff failed to state a claim for a violation of the Consumer Fraud Act. The first element of a violation of the statute—

an unfair or deceptive act—is not in dispute, as the complaint references that ComEd admitted to the bribery scheme. As to the second element, plaintiff did not allege that ComEd intended for her to rely on its deception. The complaint allegations concerning the bribery scheme focus on Madigan and his associates. The third element—a deception in the course of trade or commerce—is, like the first, not disputed.

¶ 58 Turning to the fourth element—actual damage to plaintiff, we conclude that plaintiff did not adequately plead actual damages. In her complaint, she alleged as to this element only that, because of ComEd's bribery scheme, she "has paid *more fees* to ComEd than it should have been entitled to absent the illegal and criminal scheme." (Emphasis added.) We agree with defendants that this allegation is conclusory. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 35 (because Illinois is a fact-pleading state, "bare conclusions of law or conclusory factual allegations unsupported by specific facts are not deemed admitted for the purposes of a section 2-615 motion to dismiss"). Further, plaintiff's allegation is contrary to, and undercut by, her assertions, also alleged in her complaint, that she "does not challenge any utility rate set or approved by the [ICC]" and "[t]his suit does not challenge any rate set under Illinois law." The latter two allegations are tied to her request for equitable relief—disgorgement of the benefits to ComEd from its alleged unlawful enrichment. Indeed, she further alleges in her complaint that, because she seeks equitable relief, she "need not establish that she or other consumers would have paid some lower rate but-for the bribery."

¶ 59 Finally, we conclude that plaintiff failed to adequately plead the fifth element—that defendants' deceptive act or practice proximately caused actual damage to her.

"[A] proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause. If the alleged

cause does nothing more than furnish a condition which made the injury possible and that condition causes an injury by the subsequent independent act of a third party, the creation of that condition is not the proximate cause of the injury. The term proximate cause describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm. Cause in fact can only be established when there is a reasonable certainty that a defendant's acts caused the injury or damage. Using the substantial factor test, a defendant's conduct is a factual cause of the plaintiff's injury if the conduct was a material element and a substantial factor in bringing about the injury. A defendant's acts are a legal cause only if they are so closely tied to the plaintiff's injury that [the defendant] should be held legally responsible for it. Legal cause is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable [person] would see as a likely result of [their] conduct." (Internal citations and quotation marks omitted.) *ComEd*, 2023 IL App (1st) 220105, ¶ 23.

¶ 60    "One way in which the concept of proximate cause operates is through the remoteness doctrine, which is sometimes called the direct-injury test. This doctrine states that there must be some direct relation between the injury asserted and the injurious conduct alleged." (Internal citations and quotations omitted.) *County of Cook v. Philip Morris, Inc.*, 353 Ill. App. 3d 55, 60 (2004). The doctrine can apply even if the injury was foreseeable. *Id.* at 63.

¶ 61    Plaintiff relies on *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555 (1980), which arose when the Chicago Park District sought to acquire certain property via eminent domain proceedings. In *Kenroy*, the Chicago city council rezoned the property, and valuations were offered by appraisers, including a person affiliated with two of the defendants. After a settlement

agreement in the eminent domain case, the circuit court in that case ordered the city's building commission to pay one of the defendants $10.3 million for the taking of the property. Throughout the proceedings, the defendants represented that the property had been rezoned, but two officer/members of two defendants subsequently testified (in a federal case) that the rezoning had been secured by bribery and fraud. The municipal agencies and departments approved the zoning change, allegedly in reliance on the defendants' representations. Paul Wigoda, a city alderman and member of the City's plan commission, city council, and the council's building and zoning committee, voted to approve the defendants' zoning change application, for which he allegedly received $50,000 from the two officer/members of two defendants. The plaintiffs sought a constructive trust of the portion of the condemnation award that equaled the difference in the valuation of the property before and after the rezoning, or $5 million.

¶ 62    As relevant here, the supreme court addressed whether the city's complaint, which sought damages to recover for its defense of a suit by the defendants against its building commission to secure a permit, stated a cause of action and whether the other complaint constituted a collateral attack on the final judgment entered in the eminent domain proceeding. The circuit court had dismissed the complaint, and the supreme court reversed and remanded, concluding that the complaint stated a cause of action. *Id.* at 565-67. The supreme court noted that a public officer has a fiduciary relationship with the political entity on whose behalf he or she serves, and represented beneficiaries may seek restitution from the public officer (and third parties who colluded with the fiduciary in the breach) for a breach of that fiduciary duty. *Id.* at 565. Constructive trusts have been imposed on third parties involved in a public official's breach of duty. *Id.* Addressing the rezoning ordinance, the supreme court held that, although courts ordinarily do not inquire into legislative bodies' motives, an exception exists for instances of fraud

(specifically alleged), and the city's allegations were sufficient to qualify for the exception. *Id.* at 566. The city had alleged that the rezoning ordinance resulted from fraudulent acts by the defendants, and it did not attempt "to recover funds allegedly procured through a scheme of bribery and fraud as evidenced in part by the enactment of the rezoning ordinance." *Id.* Addressing proximate cause (*i.e.*, the defendants' argument "that there is no causal connection between the alleged acts of bribery and fraud and the enactment of the rezoning ordinance and that their nondisclosure is not the proximate cause of the city's alleged injury"), the court rejected it as a basis to affirm the circuit court's dismissal, explaining that this argument was prematurely raised and "will be determined by the proof." *Id.*

¶ 63 We find *Kenroy* distinguishable. The defendants in *Kenroy* represented to the municipal agencies and departments "that the property had been properly rezoned," and the municipal entities "approved the zoning change, allegedly in reliance on representations made to them by [the] defendants." *Id.* at 559. Here, in contrast, plaintiff did not allege that she or the legislature relied on any misrepresentations by ComEd in passing the relevant legislation. Further, the relief plaintiff seeks—disgorgement of ComEd's actual and projected benefits, *i.e.*, "profits,"[5] from its bribery scheme—necessarily challenges the rates approved by the ICC, because ComEd's income and its profits are tied to the rates it charges. This is impermissible under the filed rate doctrine.

---

[5]In her opening brief, plaintiff states that she and other ComEd customers "will continue to pay the rates as set and adjusted from time to time, but that does not mean that equity allows the defendants to keep the full amount of their profits attributable to the corruptly procured legislation." In her reply brief, she states that "profits are what ComEd gained through its bribery rather than a specific *res* that could be placed in [a] constructive trust."

*Corbin*, 2019 IL App (5th) 170296, ¶ 8. In contrast, in *Kenroy*, the complaint, which was filed by the city and not a private party like here, did not seek to undo the rezoning, but, rather, sought a constructive trust over the property's valuation difference before and after the rezoning. *Kenroy*, 78 Ill. 2d at 566 (concluding that fraud exception to inquiring into legislative motives applied, "particularly since no attempt is made here to nullify the rezoning ordinance or to enjoin its operation."). Also, as defendants note, the causal relationship in *Kenroy* was sufficiently direct, where the defendants gave cash to an alderman in exchange for his vote, and, again, the relief sought did not challenge the rezoning. Finally, *Kenroy* did not involve utility rates and, thus, the filed rate doctrine did not come into play.

¶ 64    Plaintiff failed to adequately plead proximate cause because the passage of the relevant legislation was not directly related to the bribes. That is, we disagree with plaintiff's position that a *reasonable inference* from the fact that Madigan had the ability to control what "measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd" is that bribing him to secure favors in the legislature was a proximate cause of the pro-ComEd legislation passing. Although Madigan had such control and influence, these actions were too remote to tie his actions to the resulting legislation. As the First District concluded in *ComEd*, albeit in *dicta*, the bribes to Madigan's associates, without more, were not material elements in causing injury to the plaintiffs. *ComEd*, 2023 IL App (1st) 220105, ¶ 24 (although Madigan "had the ability to bring a bill to the floor, the bill had to garner the necessary votes for it to pass."). Neither plaintiff's complaint nor the deferred prosecution agreement contains allegations/statements that Madigan controlled the *votes* in both chambers of the legislature. Here, the proximate causal connection between the bribes and the ultimate passage of the relevant legislation is too attenuated. This

distinguishes this case from *Kramer*, where the Uber driver forced the passengers into a position where they would be vulnerable to negligent driving. *Kramer*, 2018 IL App (1st) 171411, ¶ 50. Further, any inquiry into the motivations of legislators' votes is impermissible under the separation of powers doctrine. See *Fletcher*, 10 U.S. at 131; see also *Murphy v. Chicago R.I. & P. Ry. Co.*, 247 Ill. 614, 619 (1910) (applying *Fletcher* in an equity case).

¶ 65 Finally, plaintiff addresses an argument the trial court did not reach, specifically, that ComEd is judicially estopped from changing its position in this case and denying it bribed Madigan, where it benefitted from the deferred prosecution agreement. "Judicial estoppel applies in a judicial proceeding when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding." *Seymour v. Collins*, 2015 IL 118432, ¶ 36. To invoke the doctrine, the party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Id.* ¶ 37. Plaintiff contends that ComEd admitted to a bribery scheme and an expected (*i.e.*, a foreseeable) benefit; it benefitted from taking that position (*i.e.*, the charges against it were dismissed); and it now seeks to walk away from that position and claim that there was no bribery of Madigan and it was not foreseeable that the bribery would or could greatly benefit it. Thus, she reasons, ComEd should be judicially estopped from denying that it bribed Madigan and that the expected result of that bribery was benefits in excess of $150 million. Defendants respond that ComEd never admitted that bribery proximately caused the passage of the legislation; rather, it admitted in the deferred prosecution agreement that "the reasonably foreseeable anticipate benefits to ComEd of *such legislation* exceeded $150,000,000." (Emphasis added.) They maintain that ComEd's admission in the deferred prosecution agreement

that the value of the benefit it received for federal sentencing purposes was merely an admission that the illegal conduct *facilitated* the benefit, which is a lower standard than "but for" causation and does not establish proximate causation. See *United States v. Ring*, 811 F. Supp. 2d 359, 377 (D. D.C. 2011) (government need not prove bribes were "but for" cause of benefit, but only that they facilitated the benefit). We agree with defendants that ComEd has not admitted that the bribery *proximately caused* the passage of the relevant legislation.

¶ 66    In summary, the trial court did not err in finding that plaintiff failed to state a claim for a violation of the Consumer Fraud Act.

¶ 67                                III. CONCLUSION

¶ 68    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 69    Affirmed.